IN THE UNITED STATES DISTRICT COURT



**FILED**

FOR THE DISTRICT OF MONTANA

**APR 3 0 2012**

PATRICK E. DUFFY  CLERK
BY_____
        Deputy Clerk
U.S. DISTRICT COURT
BILLINGS DIVISION

BILLINGS DIVISION

---

UNITED STATES OF AMERICA,

Plaintiff/Respondent,

vs.

GULMARO TORRES-LEON,

Defendant/Movant.

Cause No. CR 07-086-BLG-RFC
CV 09-111-BLG-RFC

ORDER DENYING REMAINING
CLAIMS AND DENYING
CERTIFICATE OF APPEALABILITY

---

## I. Background

This case comes before the Court on Defendant/Movant Torres-Leon's motion

to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255.  Torres is a

federal prisoner proceeding with appointed counsel.  On June 18, 2008, he was

convicted of conspiracy to distribute methamphetamine and sentenced to serve 360

months in prison.

Several claims have already been denied.  Two claims remain.  One pleads

ineffective assistance of counsel.  The other, which Torres moves to add to his § 2255

motion at this time, alleges that the United States violated its obligations under *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Those two claims have now been fully briefed.

### A. Conspiracy, Double Jeopardy, and the Ineffective Assistance Claim

On July 12, 2006, a grand jury in the District of Colorado handed down a two-count indictment charging Torres and two co-defendants. Count 1 alleged:

> On or about and between March 1, 2006, and June 21, 2006, both dates being approximate and inclusive, within . . . Colorado *and elsewhere*, the defendants, [UTV], GUMARO [sic] TORRES-LEON and [JC],[1] did knowingly and intentionally conspire to distribute and possess with the intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance[,] . . . in violation of Title 21, United States Code, Sections 846, 841(a)(1) and (b)(1)(A).

D. Colo. Indictment (doc. 292-3) at 1-2. A substantive count was also pled. *Id.* Torres pled guilty to Count 1, the conspiracy count. He was sentenced in March 2007.

On June 22, 2007, Torres and six co-defendants were indicted in the District of Montana. Count 1 alleged:

> That from on or about May 6, 2005, up to and including an unknown date in May 2006, at Billings, Montana . . . *and elsewhere*, Defendants Gulmaro Torres-Leon, [KTW, JM, BM, MS, AS, and TM], and *others both known and unknown to the Grand Jury*, did knowingly and unlawfully conspire, combine, confederate and agree to possess with intent to distribute and distribute, in violation of 21 U.S.C. § 841(a)(1),

---

[1] Initials are used throughout this Order in the event investigations may be ongoing.

over 500 grams of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. § 846.

Superseding Indictment (doc. 56) at 2. Torres also pled guilty to this conspiracy count. He was sentenced in June 2008.

Torres now contends that his second guilty plea was involuntary. He asserts that a reasonable defense attorney would have spotted and attempted to flesh out the possibility of a double jeopardy defense and that, had the defense been explored, there was a reasonable probability Torres would have chosen to pursue it at trial rather than pleading guilty. *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).[2]

Torres's inclusion in both indictments, the identity of the crime charged, the overlapping time periods, and references to "elsewhere" and "others both known and unknown to the Grand Jury" suggest that one conspiracy might be alleged. The double jeopardy clause protects defendants against, among other things, successive

---

[2] *Hill* emphasized that whether a reasonable defendant would have chosen trial over a guilty plea is in essence the same inquiry as whether a reasonable attorney would have recommended trial over a guilty plea and whether there is a reasonable probability that a defendant would have prevailed at trial:

> For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial.

*Hill*, 474 U.S. at 59.

prosecutions for the same crime. *United States v. Ziskin*, 360 F.3d 934, 943 (9th Cir. 2003). Where a conspiracy is charged, the crime is the agreement with others to commit one or more offenses. These offenses may take place in one or more locations, multiple persons may enter and leave the conspiracy at various times, and the agreement may continue over a long period of time, all without becoming more than one agreement or conspiracy. *Braverman v. United States*, 317 U.S. 49, 53 (1942); *see also, e.g.*, *United States v. Morales*, Nos. 10-50419, *et al.*, 2012 WL 76911 at **2-3 (9th Cir. Jan. 11, 2012) (unpublished mem. disp.).

"Because the government can tailor the . . . acts[3] charged in each indictment," artful pleading by a prosecutor, rather than the reality of a situation, "may account for a single conspiracy's being capable of proof in several prosecutions requiring different evidence for conviction." *United States v. Papa*, 533 F.2d 815, 820 (2d Cir. 1976). Where the pleading is artful but a defendant has actually participated in only one conspiracy, a second or successive conspiracy prosecution violates the double jeopardy clause, even if the evidence required to prove the second charge differs significantly from that required to prove the first. For that reason, defense counsel

---

[3] The word omitted here is "overt." It is omitted because an overt act is not required to prove a drug conspiracy under 21 U.S.C. § 846. *United States v. Shabani*, 513 U.S. 10, 17 (1994). Instead, courts "look . . . to the acts defined in the evidence at the trial or at any hearing" to determine whether one or more than one conspiracy existed. *United States v. Deshaw*, 974 F.2d 667, 674 (3d Cir. 1992).

must carefully examine the facts of each case to ensure that a conspiracy is not "subdivided arbitrarily in such a way as to result in multiple indictments on a single conspiratorial agreement." *Id.*

### B. Motion to Amend to Add a *Brady* Claim

As Torres's § 2255 proceeding has progressed, the possibility of a single conspiracy has been somewhat enhanced by the United States' late – very late – realization that the name of one of Torres's Colorado co-conspirators, UTV, was redacted from the discovery provided to Torres's Montana trial counsel. Although the redacted discovery closely connected Torres with FOA, that connection appeared to be focused on supplying methamphetamine to KTW and others in Denver for transport to Montana and possibly other places. But the unredacted discovery shows that Torres and FOA's agreement included both UTV's and KTW's operations during the time period of the Montana indictment.

Torres, accordingly, has moved to add a claim under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), to his § 2255 motion, arguing that the United States' redaction of UTV' name withheld material evidence of his involvement with both Torres and FOA – evidence that was exculpatory because it supported a double jeopardy defense. Although the *Brady* claim is a new legal theory, it is closely connected with the operative facts of the double jeopardy defense and with what trial counsel knew or

should have known. *See Mayle v. Felix*, 545 U.S. 644, 664 (2005). In addition, Torres could not have made the *Brady* claim before he received the unredacted discovery. 28 U.S.C. § 2255(f)(4).

The motion to amend is granted, and the *Brady* claim will be considered on the merits along with the ineffective assistance claim.

## II. One Conspiracy or Two?

As to both claims, the question is whether Torres participated in one conspiracy – involving at least FOA, KTW, and UTV and encompassing acts carried out in Montana, Denver, and perhaps elsewhere – or whether Torres participated in more than one conspiracy with one or more of those persons. More specifically, the question is whether a reasonable attorney and a reasonable defendant, searching for evidence to support a jury finding that the defendant engaged in one overarching conspiracy, would have found enough evidence to warrant going to trial instead of pleading guilty. *Hill*, 474 U.S. at 59. The *Brady* claim dovetails with this analysis because it supplies additional evidence for the reasonable attorney and reasonable defendant to consider. If all the evidence does not support finding one conspiracy, then the redaction of UTV's name was not sufficiently material or exculpatory to support a *Brady* claim or warrant relief under § 2255. *United State v. Bagley*, 473 U.S. 667, 682 (1985); *see also Strickland v. Washington*, 466 U.S. 668, 694 (1984)

(stating that standard for assessing prejudice on ineffective assistance claim is identical to "the test for materiality of exculpatory information not disclosed to the defense by the prosecution") (citing *United States v. Agurs*, 427 U.S. 97, 104, 112-13 (1976)).

## A. Facts in the Record

The following facts are taken from the record of the entire case in this Court, which includes the Complaint, Indictment, and Plea Agreement in the Colorado case, and the unredacted discovery produced by the United States in the § 2255 proceedings. Although, on summary judgment, facts are typically construed in the light most favorable to the non-moving party – here, the United States – in this case all facts have been construed from the perspective of a reasonable defense attorney and a reasonable defendant searching for evidence to support a jury finding that Torres engaged in one overarching conspiracy.

Such construction does not allow me to ignore facts; it means only that when there is contradictory evidence as to a fact, I will assume the true fact is the one that favors finding one conspiracy. So, for example, although Torres introduces only the indictment and the plea agreement from the Colorado case, the United States has filed the criminal complaint as well, and it contains a report of Torres's own statements at the time of his arrest. Torres has not claimed he did not make these statements or that

they were misunderstood. Therefore, the report of his statements is presumed accurate. *Cf. Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (on motion for summary judgment, evidence may be presented in inadmissible form so long as its contents would be admissible).

If, viewing the facts from this perspective, a reasonable person would, to a reasonable probability, choose to go to trial, *Hill*, 474 U.S. at 59, then Torres prevails on his § 2255 motion.[4]

Although I will construe the available facts in favor of finding one conspiracy, Torres still has the burden of proof. *Ziskin*, 360 F.3d at 943; *United States v. Bendis*, 681 F.2d 561, 564 (9th Cir. 1981) (citing *Sanchez v. United States*, 341 F.2d 225, 227

---

[4] There is almost always one distinct advantage in pleading guilty. A guilty plea will probably result in at least a two-level reduction for acceptance of responsibility, and, in more serious cases such as this one, probably a three-level reduction. U.S.S.G. § 3E1.1. Going to trial with a double jeopardy defense, however, might put Torres in the small class of persons who "go[] to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge . . . to the applicability of a statute to his conduct)." U.S.S.G. § 3E1.1 Application Note 2; *see, e.g., United States v. Rosenthal*, 266 F. Supp. 2d 1091, 1096 (N.D. Cal. 2003) (awarding downward adjustment where defendant conceded factual elements of offense but presented legal defense of immunity at trial). It would depend on what facts he contested at trial. Granting of the third point depends on a motion from the United States; presumably it would not have made the motion. Still, in sum, the usual two- to three-point advantage that a guilty plea has over trial might have been only a one-point advantage. A reasonable attorney would take account of the possibility of a two-point reduction – and the uncertainty of it – in making a recommendation as to the plea. Because counsel's recommendation had to be made before sentencing, counsel could not have predicted the obstruction of justice enhancement. Sentencing Tr. at 41:4-42:16. With a three-point reduction under U.S.S.G. § 3E1.1, therefore, a reasonable projected advisory guideline range would have been 235-293 months; with a two-point reduction, 262-327 months; and with no reduction, 324-405 months. Presentence Report ¶¶ 33-42, 45; U.S.S.G. ch. 5 Part A (Sentencing Table). The difference among these ranges – roughly two and a half to nine and a third years – would be an important factor in Torres's decision.

(9th Cir. 1965));[5] *see also Hill*, 474 U.S. at 59 (defendant/movant has burden of proving ineffective assistance of counsel). Torres has not introduced any new evidence about the Colorado case. He also "contends that an evidentiary hearing is not necessary or warranted." Def. Mot. for Summary Judgment (doc. 306) at 2. Accordingly, the record is closed.

Sometime before May or June 2005, KTW was engaged in drug dealing with FOA, among others, in Colorado and Montana. FOA fronted methamphetamine to KTW, who in turn sold it to others. It appears that, at the time, FOA was acting either as a partner with Torres or as a middleman between KTW and Torres. After a drug debt owed to "FOA's supplier" was blamed on KTW, she began to obtain methamphetamine from Torres "directly, without FOA." Offer of Proof ¶ 1.[6] Torres charged $14,000 per pound. *Id.* ¶ 7. FOA and Torres shared the same source for their methamphetamine; they obtained it in Arizona, but it originated in Mexico. Between

---

[5] On a pretrial motion to dismiss, the United States has a burden to produce evidence showing that a jury could find two distinct conspiracies where a defendant raises a non-frivolous double jeopardy defense. *Bendis*, 681 F.2d at 564; *see also, e.g., Morales*, No. 10-50419, 2012 WL 76911 at **2-3 (remanding for pretrial evidentiary hearing where five defendants made non-frivolous showing that they were previously convicted of participating in one conspiracy involving 24 members and continuing for period of years). Even then, the ultimate burden of proof rests with the defendant, though, as *Bendis* points out, "in practical effect" the government may have the burden of persuading the court to let the case go to a jury. *Bendis*, 681 F.2d at 564.

[6] The Offer of Proof is contained within the Plea Agreement, which is sealed. For easier reference, its paragraphs are consecutively numbered as set forth at Torres's change of plea hearing. Paragraph 1 is the first substantive paragraph beginning on page 5, paragraph 9, of the Plea Agreement. *See* Change of Plea Tr. (doc. 229) (sealed) at 31:7-11.

May or June 2005 and November 2005, Torres brought four ounces to one pound of methamphetamine every week from Arizona to KTW in Denver, and she would take the methamphetamine to Wyoming or Montana for further distribution. KTW testified that, when she met with Torres or picked up methamphetamine, she would occasionally see other people, "six [or] eight" over time, who were involved with Torres in Denver. Sentencing Tr. (doc. 227) (sealed) at 7:23-8:12. Whether KTW knew him or not, these other people included UTV. Unredacted Discovery 132, 136. Torres traveled to Montana once with KTW, *id.* at 33:6, "to make an appearance" and let the distributors down the line "know who the boss was, who KTW was getting her instruction from." *Id.* at 5:21-6:9. He might have traveled to Montana on another occasion with FOA.[7] *Id.* at 33:6-7. Torres directed KTW as to "price, quantity, what he had available" for her to resell to others, but "KTW had her own customers" and "would use her discretion to distribute to whom she wanted to." *Id.* at 13:8-13, 32:6-10.

From December 2005 until May 2006, KTW obtained methamphetamine from "an unindicted co-conspirator." Offer of Proof ¶¶ 2-3. If this person was FOA or his previous supplier, or if it was someone known only to KTW, the analysis does not

---

[7] During this period, FOA was still involved in Montana. He was arrested in Billings in October 2005, but he was released and resumed his previous activities.

change. Torres does not produce evidence to show it was UTV, JC, HC, the confidential informant who was involved in the Colorado case, or anyone else whose involvement might add support to the one-conspiracy hypothesis.[8]

In February 2006, federal drug agents based in Denver, Colorado, began an undercover investigation into the activities of JC and one HC. JC offered to sell an unidentified confidential informant ("CI") 10 pounds of methamphetamine for $13,000 per pound. JC claimed to have multiple sources of supply. No transaction occurred at that time. D. Colo. Compl. (doc. 292-2) at 2-4 ¶¶ 3-7.[9]

In April 2006, at the request of investigating agents, KTW contacted FOA and arranged to purchase a half-pound of methamphetamine from him. FOA later called KTW to tell her Torres would make the delivery. When Torres met with KTW later that day, he told her he brought the methamphetamine from Phoenix. Offer of Proof ¶ 4;[10] Unredacted Discovery 8-10.

---

[8] There is a reference to another supplier, AA-R, who "sourced" FOA and with whom KTW sometimes dealt "separate of" FOA. Unredacted Discovery 16, 17, 22, 31. Again, however, it makes to the analysis whether this person was AA-R or someone else.

[9] Docket references are to this Court's record. The dates on which court proceedings occurred in the District of Colorado are taken from that court's electronic docket.

[10] The United States alleged that Torres also told KTW that he and FOA were "partners," Offer of Proof ¶ 4, but Torres denied that statement at the change of plea hearing, Change of Plea Tr. at 31:23-32:7. Regardless, their partnership is readily established by the evidence and does not harm Torres's position in this collateral litigation.

In interviews, KTW[11] described Torres as FOA's "security" and as someone who regularly transported methamphetamine from Phoenix to Denver. She also said FOA or others associated with him, including Torres, brought about six pounds to Denver on each trip from January 2005 to the time of the interview in April 2006. She, FOA, Torres and others would unwrap the original packaging and divide the contents into smaller packages. She did not say they "cut" the methamphetamine. Unredacted Discovery 15-16.

In May 2006, FOA was arrested on federal drug charges filed in this Court. In a statement to law enforcement, he attributed several-ounce quantities to himself but pounds to KTW, claimed that Torres was his source and "the boss," denied going to Phoenix himself to obtain methamphetamine, and generally portrayed himself as a distributor moving product from Denver to Wyoming or Montana at a lower level than KTW. (As to some occasions, he was right. *E.g.*, Unredacted Discovery 22.) He later altered these facts as explained below. He correctly stated, however, that Torres drove a maroon Nissan with Arizona plates and arranged to deliver methamphetamine at public places, including the Home Depot parking lot in Denver. Unredacted Discovery 40-42.

I see no indication in the record that Torres was involved in Montana or with

---

[11] *Compare, e.g.*, Offer of Proof ¶¶ 1, 4, *with* Unredacted Discovery 8-9, 20.

KTW or FOA after FOA's arrest in May 2006.[12] That is the termination date of the conspiracy alleged in the Montana case.

On June 19, 2006, back in Denver, JC contacted the CI – Torres has not identified this person – and offered methamphetamine from a new source. The same day, the CI and JC met at a local restaurant with JC's new source, UTV. Two days later, the CI met at an automotive repair shop with two men, JC and UTV, driving a blue Chevrolet truck. Agents tailed the truck to a nearby park, where they saw the two occupants meet with a third man, who was driving a "dark colored" Nissan sedan with an Arizona plate registered in Phoenix. D. Colo. Compl. at 4-6 ¶¶ 8-14.

Later the same day, the CI told the agents he would meet JC and UTV at a Home Depot parking lot and purchase six pounds of methamphetamine. JC and UTV approached the CI in the blue Chevy truck. While the CI was at the Chevy's passenger window talking to JC, the Nissan sedan pulled up next to the truck. UTV directed the CI to go to the Nissan to see the methamphetamine. The driver of the

---

[12] A grand jury indicted FOA for conspiring to possess with intent to distribute over 50 grams of actual methamphetamine between September and November of 2005. A substantive count was also pled. The charges were based in part on the seizure of ten ounces of methamphetamine at a hotel in Billings, Montana. The record of his case in this Court shows that he was arrested in Denver on May 11, 2006. Offer of Proof ¶ 6.

On April 13, 2006, FOA told KTW that "his distribution to Montana was still active." He explained that "a guy from Montana was driving to Denver and picking up two to three pounds of methamphetamine at a time to take back to Montana." Plea Agreement (doc. 25) (sealed) at 6 ¶ 9 subpara. 5, No. 1:06-CR-62-RFC. There is no evidence in the record in this case or FOA's suggesting that this "guy" was UTV.

Nissan identified himself as "Gumaro."[13] Torres showed the CI six pounds of methamphetamine. When the CI left the Nissan, he gave the signal for the agents to make an arrest. D. Colo. Compl. at 6-8 ¶¶ 16-24.

When arrested, Torres admitted the methamphetamine belonged to him. He stated that he purchased it in Mexico for $8,000 and intended to sell it in the United States for $10,000. He also said he had one more pound at his apartment. JC told agents that he and UTV had arranged the sale with Torres earlier that day at a park. D. Colo. Compl. at 5-6 ¶ 13, 9 ¶ 26. Later, in September 2006, Torres contradicted these statements, telling agents that he obtained the Colorado methamphetamine in Phoenix, not Mexico, and also that he did not know how the drugs wound up in the Nissan. Unredacted Discovery 4.

On December 7, 2006, FOA gave a statement. He told agents that the methamphetamine sold by him and Torres originated in Mexico, was smuggled across the border to the Phoenix area, then cut with horse vitamins to make a pound and a half out of each pound of pure methamphetamine. He and Torres brought ten to fifteen pounds of methamphetamine three to six times per month from Phoenix to Denver – between February and April 2006, occasionally twenty pounds. He, like

---

[13] Torres's name was spelled without the L throughout the Colorado case. But if that wasn't him, he loses his double jeopardy argument.

KTW, did not say he and Torres further "cut" the methamphetamine. FOA said that other people, working for the same organization, distributed methamphetamine all across the country, from Los Angeles to North Dakota to Atlanta. He said two or three pounds regularly went to Montana from Denver. FOA also identified UTV as one of Torres's regular customers who received two pounds each time Torres and FOA brought meth from Phoenix to Denver. FOA did not know UTV's last name and did not say whether UTV knew him. Unredacted Discovery at 128-130, 132, 136.

On December 8, 2006, Torres pled guilty to conspiracy to distribute methamphetamine in the District of Colorado. He agreed that UTV and JC began negotiating a methamphetamine purchase "in the early months of 2006," D. Colo. Plea Agreement (doc. 292-4) at 4, and, to facilitate that purchase, he agreed to supply methamphetamine to UTV and JC "for distribution in Colorado," *id.*

At some point after the Colorado sentencing in March 2007, Torres was transported by the United States Marshals Service to Montana, along with FOA and KTW. KTW said that Torres told her, during the flight, "[t]hat FOA's family lived in California" and there were "already people there just waiting" for her to arrive in prison if she "ratted" on her co-defendants. Sentencing Tr. 22:14-23:9; *see also id.* at 9:14-10:2.

Laboratory analysis of methamphetamine seized from FOA in October 2005

showed it to be 63% to 70% pure – a figure consistent with producing a pound and a half of methamphetamine by cutting one pound of methamphetamine with horse vitamins. The methamphetamine seized from Torres in the Home Depot parking lot in Colorado was 45% pure. Torres Presentence Report ¶ 25.

## B. The *Arnold* Factors

To determine whether one conspiracy or two or more are charged, courts in the Ninth Circuit employ a five-factor test. *Ziskin*, 360 F.3d at 944; *United States v. Arnold*, 336 F.2d 347, 348-49 (9th Cir. 1964). "No single factor . . . controls the determination of whether there was a single conspiracy; after consideration of all, the question is whether there was more than one agreement." *Guzman*, 852 F.2d at 1121 (citing *Bendis*, 681 F.2d at 568).

### 1. Time Frames

The time frames of each indictment overlap. The Montana indictment commences ten months before the Colorado indictment, and the Colorado indictment terminates a month and a half after the Montana indictment. Although one period does not encompass the other, the overlap is significant and would tend to support finding one conspiracy.

### 2. Participants and Roles in the Offense

Torres's role in both cases is similar. He brought methamphetamine to Denver

and sold it to persons there for further distribution. He also accompanied KTW to Montana on one occasion to "check out" downline receiver-distributors and ensure that payment was received. That seems to be what he was doing when he was arrested in the Home Depot parking lot in Denver as well.

Although it is clear that both Torres and UTV were involved in the conspiracy alleged in the Montana case, they are the only persons who also participated in the Colorado conspiracy. There is no evidence that FOA – who was arrested in May 2006 – played any role in the Colorado transaction. Further, there is no evidence Torres joined the conspiracy alleged in the Colorado case before June 19, 2006. UTV's and Torres's participation in the Montana conspiracy is at best meager evidence that the Montana and the Colorado conspiracies were the same conspiracy. The lack of evidence on this factor tends to support finding two conspiracies, but a closer look is required.

### 3. Places the Offense Occurred

In each case, methamphetamine was sold in Denver to various people who would further distribute it "in Colorado." The discovery associated with the Montana case reveals an extensive conspiracy extending to many, far-flung states – California, Georgia, North Dakota, and elsewhere. There is no indication of such extension in the Colorado case, but of course the Colorado case could be an instance of the far-

flung Montana conspiracy. This factor may tend to support finding one conspiracy, but again, a closer look is required.

### 4. Offense Charged

The offenses are identical. This factor supports finding one conspiracy.

### 5. Acts Shown by the Evidence

The acts shown by the evidence are similar in nature. In each case, Torres and FOA transported methamphetamine to Denver and sold it to others who would in turn sell it to smaller distributors or users. But all sales of methamphetamine for further distribution are similar in nature.

Here, there is no evidence that both indictments encompassed any of the *same sales*. Moreover, as discussed below, the price and quality of the methamphetamine itself appears to have been different in the Montana and Colorado cases, and this distinction was entirely unforeseen by the persons debriefed in the Montana case. Even though each conspiracy aimed to sell methamphetamine, the acts underlying each conspiracy are distinct. This factor supports finding two conspiracies.

### C. One or More?

The facts show that Torres agreed with FOA to obtain methamphetamine in Phoenix and transport it to Denver to be fronted to various subordinate dealers. Torres and FOA each had "reason to believe that whatever benefits [he] might get

from the conspiracy were probably dependent" upon the other's success. 9th Cir. Crim. Jury Instr. 8.23 (2010).[14] At one point, Torres stepped into FOA's shoes as KTW's supplier. At another point, he assisted FOA by delivering methamphetamine to KTW. When Torres perceived KTW to be a danger to both him and FOA, he gave further support to this view of his relationship with FOA by threatening KTW to keep her quiet on behalf of both of them. Torres specifically referred to FOA's family as the potential enforcers of the threat. All of this is compelling evidence of an agreement between Torres and FOA (at least) that included keeping KTW operating and quiet.

I also find that UTV, like KTW, joined in the agreement between Torres and FOA. There is no indication that UTV knew of FOA, but "one may become a member of a conspiracy without full knowledge of all the details of the unlawful scheme or the names, identities, or locations of all of the other members." 9th Cir. Crim. Jury Instr. 8.23 (2010). UTV regularly distributed two pounds of methamphetamine after every trip FOA and Torres made from Phoenix to Denver. That fact "demonstrate[s] a substantial level of commitment" on UTV's part to "engag[e] in a consistent series of smaller transactions that furthered [the] ultimate object of supplying the consumer demand of the market" shared by FOA and Torres,

---

[14] *See also* 9th Cir. Crim. Jury Instr. 8.18 (2003).

*United States v. Banks*, 10 F.3d 1044, 1054 (4th Cir. 1991) (internal quotation marks and citation omitted), regardless of what UTV knew about who was sharing the market. After all, the United States "doesn't have to prove *with whom* a defendant conspired," only "that the defendant joined the *agreement* alleged, not the group." *Townsend*, 924 F.2d at 1389 (emphases added).

But none of this evidence gives rise to an inference that the agreement in which Torres, FOA, KTW, and UTV all participated persisted beyond May 2006 into June. True, Torres's "modus operandi" was consistent with respect to both KTW and UTV. He acted as their supplier. He accompanied them to "check out" downline receiver-distributors. He used the Home Depot parking lot, as FOA might have predicted. But Torres's own admissions about his involvement with UTV and JC in June suggest an agreement of very limited scope involving them and no one else – in particular, not FOA. And it was not the same meth. *See* Am. Mot. (doc. 271) at 5 ("In the Colorado case . . . the Movant states that it was a different methamphetamine and not the same as he was distributing" in Montana).

JC contacted the CI on June 19. Just two days later, Torres had seven pounds of methamphetamine on hand, six in the Nissan at UTV's disposal. According to FOA, for UTV to obtain six pounds of methamphetamine from Torres, Torres would have had to make three trips from Phoenix to Denver in two days. Torres himself said

he obtained the methamphetamine in Mexico, not Phoenix, two months after he told KTW that he and FOA obtained her meth from Phoenix. Torres introduced no evidence to show that the Phoenix methamphetamine he dealt together with FOA came from the same originating source in Mexico[15] as the methamphetamine Torres was ready to sell, through UTV, to JC and the CI. FOA's meth, seized in October 2005, was more pure than the meth Torres and UTV arranged for JC and the CI to buy. Both KTW and FOA failed to mention any role in "cutting" the methamphetamine. Although FOA knew who did it and how, the cutting occurred before he received it. Torres's meth was only 45% pure; someone obviously cut it more than the meth Torres and FOA received in Phoenix. The price, too, was different. Torres admitted he charged $14,000 per pound for the meth he sold in Montana, but he said he expected only $10,000 per pound for the (less pure) Colorado meth. And, finally, there is no evidence that Torres was involved at all in the Colorado transaction before mid-June 2006, when FOA had already disappeared from the scene.

Alternatively, in April 2006, KTW said that FOA and Torres brought about six pounds of methamphetamine to Denver each time they came over from Arizona.

---

[15] Mexico is a big country. There is probably more than one place within it where methamphetamine is manufactured.

Construing the facts in the light most helpful to Torres – which requires ignoring what he himself said about the price and source of the Colorado meth – one might suppose the six pounds he had with him in the Nissan when he met JC and the CI were brought in one trip from Phoenix. That hypothesis would show that FOA's arrest materially altered Torres's ability to move methamphetamine. After all, KTW said six pounds was the total amount of methamphetamine brought on each trip, and Torres was trying to sell six pounds at once to one person. This possibility gives further support, if any were needed, to the finding of a functioning partnership between Torres and FOA.

But even if that hypothesis is true, it does not assist Torres in carrying his burden of showing that his previous agreement, which included all his work with FOA, also included the Colorado transaction. There is no evidence that Torres continued or believed himself to be continuing to carry out his prior agreement by selling three times more methamphetamine to UTV. Even putting to one side the discrepancies in the price and quality of the meth, Torres shows no phone calls to FOA's people or suppliers, no evidence as to whether other aspects of the previous agreement continued, such as the time allowed for payment, and no evidence even to show whether the Colorado meth was fronted to Torres.

Torres himself would know the truth about all these things, yet all the evidence

he presents about the Colorado case are the documents introduced into this record from that prosecution. Those documents are sparse indeed. Maybe Torres obtained the meth from the same source as his and FOA's meth. But there is as much evidentiary support – i.e., virtually none – for the idea that Torres stole meth bit by bit over a long period of time, aggregated and diluted it until he had seven pounds, and then sold it, with UTV's help, to earn $10,000 free and clear.

There simply is not enough evidence here to support a reasonable attorney in recommending trial. Nor would a reasonable defendant choose to present these facts at trial in the hope of an acquittal on double jeopardy grounds, when conviction at trial could make a difference of two and a half to nine and one-third years in his sentence.

As to the *Brady* claim, even in the face of Torres's recalcitrance with his own attorney, the possibility of a double jeopardy defense should have been clear both to defense counsel and the United States on the face of the indictment and Torres's criminal history. But the revelation of UTV's name in FOA's debriefing was not so exculpatory of Torres as to have required disclosure under *Brady*. It is worth noting, in particular, that Torres himself not only knew everything he needed to know about UTV, but he also knows more than the United States ever will know about the facts of the Colorado case. Although UTV's name should have been disclosed, no real

prejudice resulted from its redaction.

Torres has failed to carry his burden of proof on his two remaining claims. They are denied.

### III. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2255 Proceedings. A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

I note that counsel concluded, after reviewing the case, that the claims Torres brought *pro se* – except his claim of ineffective assistance based on double jeopardy and the later-discovered *Brady* claim – should be abandoned. Supp. to Am. § 2255 Mot. (doc. 285) at 5-6. I agreed then, and I agree now.

The factual bases of some of Torres's claims are contradicted by the record of the case. These include his claims that he went through the entire underlying case

without a competent translator, *compare* Minutes (docs. 78, 157, 199, 209), Staff Notes (Nov. 13, 2007; Jan. 24, 2008; Mar. 3, 2008; May 28, 2008), *with* Am. Mot. (doc. 271) at 4, Br. (doc. 271-1) at 5, 19-20; that he was not adequately advised about the potential sentence, *compare* Change of Plea Tr. at 8:1-9 *with* Br. at 3-4; that the Court "intervened" in his case at the change of plea hearing, *compare* Change of Plea Tr. at 21:11-27:14, Fed. R. Crim. P. 11(b)(1)(N), (b)(2), *with* Am. Mot. at 5-6, Br. at 14-16; and that counsel did not argue against the enhancements imposed at sentencing, *compare* Sentencing Tr. at 11:18-13:13, 18:12-20:3, 25:10-30:3, 32:3-33:13, 35:16-37:16, Presentence Report Addendum at 1 *with* Am. Mot. 4-5, 7, Br. at 7-14, 20-23. No reasonable jurist would find a basis for a COA in these claims.

Some of Torres's claims failed to allege any prejudice. These include his claims that counsel did not investigate the quality of the methamphetamine attributed to him, *compare* 21 U.S.C. § 841(b)(1)(A)(viii) *with* Am. Mot. at 5, Br. at 7; and that he was not personally asked, before the sentencing hearing began, whether he had reviewed the presentence report with counsel, Br. at 19-20. Because no prejudice is realistically possible, *see* Supp. to Am. § 2255 Mot. at 5-6; Order Denying Some Claims (doc. 286) at 9-10, a COA is not warranted as to these claims either.

Although Torres sufficiently alleged prejudice in connection with both counsel's failure to raise a double jeopardy defense and his *Brady* claim, he failed to

prove prejudice. The facts of the Colorado case, sparse as they are, do not support an inference that Torres was continuing, when he sold methamphetamine to UTV, JC, and the CI in June 2006, to execute the same agreement he had with FOA, KTW, UTV and probably others from May 2005 through May 2006. Torres himself said the methamphetamine came from a different source, its purity and price were different, and he added nothing to the record pre-existing the § 2255 proceedings to show that the Colorado conspiracy was part of the same large conspiracy as that alleged in the Montana indictment. Because the proof fails even to meet the low threshold of a showing with some non-frivolous substance to it, a COA is not warranted on this claim.

Torres's claim that he "did not have a complete understanding of what he was pleading guilty to," Am. Mot. at 4, failed to specify any particular understanding he lacked. A COA is not warranted on this claim.

Finally, Torres's claim that he was denied free copies of his case records, Am. Mot. at 6, could not be a basis for relief under § 2255. Moreover, Torres received the free copies to which he was entitled during the course of the criminal case. He was not entitled to additional copies at public expense after his case had concluded and before he filed his § 2255 motion. A COA is not warranted as to this claim.

Accordingly, IT IS HEREBY ORDERED as follows:

1. Torres's motion to amend his § 2255 motion to add a claim under *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (doc. 305) is GRANTED;

2. Torres's claims that counsel should have explored a double jeopardy defense and that the United States violated the rule of *Brady* are DENIED;

3. Torres's motion for summary judgment (doc. 306) is DENIED;

4. All claims having been denied, Torres's motion to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255 (docs. 259, 271, 285) is DENIED;

5. A certificate of appealability is DENIED as to each claim. The Clerk of Court shall immediately process the appeal if Torres files a Notice of Appeal;

6. The Clerk of Court shall ensure that all pending motions in this case and in CV 09-111-BLG-RFC are terminated and shall close the civil file by entering judgment in favor of the United States and against Gulmaro Torres-Leon.

DATED this 30th day of April, 2012.

Richard F. Cebull, Chief Judge
United States District Court